*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

*UNITED STATES OF AMERICA* )
 )
*v.* )  *Criminal No. 07-99-P-S*
 )
*CHRISTOPHER POULOS,* )
 )
  *Defendant* )

### RECOMMENDED DECISION ON MOTION TO SUPPRESS

Christopher Poulos, charged with four counts of cocaine distribution in violation of 21 U.S.C. § 841(a)(1) and one count of possession of a firearm (a Ruger .357 revolver) in furtherance of a drug-trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i), seeks to suppress evidence seized from his Portland, Maine apartment on April 9, 2007 pursuant to a search warrant.  *See* Indictment (Docket No. 3); Motion To Suppress Evidence, etc. ("Motion") (Docket No. 25).[1]  An evidentiary hearing was held before me on January 18, 2008 at which the defendant appeared with counsel and at the conclusion of which counsel for both sides argued orally.  I now recommend that the following findings of fact be adopted and that the Motion be denied.

### I.  Proposed Findings of Fact

In February 2007 Kevin Cashman, a Portland, Maine police detective assigned to work as a special agent for the Maine Drug Enforcement Agency ("MDEA"), received information from a

---

[1] The defendant also initially sought to suppress statements, *see* Motion at 11-12; however, at hearing, counsel for the government confirmed that the government will not seek to introduce, in its case-in-chief, any statements made by the defendant to officers on April *(continued on next page)*

confidential informant ("CI") that an individual named Christopher Poulos (the "defendant") was selling drugs. The CI agreed to participate in controlled purchases of drugs from the defendant and proceeded to do so on four occasions (March 1, 6, 14 and 23, 2007). Following one of the controlled drug purchases, the CI informed Cashman that he saw the defendant placing a silver handgun above a ceiling tile in the kitchen/living-room area as he entered the defendant's apartment.

Subsequently, in April 2007, Cashman learned that Portland police were investigating a suspected discharge of a firearm from the defendant's apartment (located in the basement of 202 Coyle Street in Portland, Maine). Cashman became involved in that investigation and was assigned the task of preparing an affidavit in support of an application for a warrant to search the defendant's apartment. On April 9, 2007 he prepared an affidavit and a proposed warrant authorizing that search. The affidavit sought, and the proposed warrant stated that it would grant, authority to search for the following property or articles:

> A.   Firearms, ammunition, explosive devices or other devices which by design or use are capable of producing serious bodily injury, and which by their concealment, placement or condition are used, intended for use, or capable of use to defend, protect, guard or secure the premises to be searched, its contents, and/or any occupant. Items, including, but not limited to: Bullet casings, Gun shot residue, and Damage to the interior of the residence caused by the discharge of a firearm.

> B.   Evidence demonstrating identity, possession, dominion, custody or control by any and all individuals over/in the premises to be searched or any portion thereof **ONLY IF SUCH PREMISES IS IN FACT FOUND TO CONTAIN** any other described item(s), including, but not limited to: fingerprints, hairs, fibers, nail clippings; clothing such as shirts, shoes; documents such as titles, deeds, bills, books, receipts, blank checks containing names and/or addresses, canceled checks containing names and/or addresses, records, addressed mail; photographs; videotapes, keys; prescription bottles; personalized property such as engraved trophies, stationery, pens; all of which are evidence of the offenses of possession, furnishing, and/or trafficking scheduled drugs and

---

9, 2007. Defense counsel agreed that the government's position moots that portion of his motion seeking suppression of statements.

which are seizable pursuant to Maine Rule of Criminal Procedure 41 and/or
Maine Rule of Civil Procedure 80I.

Search Warrant ("Warrant"), Joint Exh. 1, at 2; Affidavit and Request For Search Warrant
("Affidavit"), attached thereto, at [2].  In the Affidavit, under the heading "Reason for Seizure,"
Cashman checked boxes indicating: "Property that constitutes evidence of the commission of a
criminal offense"; "Contraband under 17-A.M.R.S.A. § 211 Reckless Conduct"; "The fruits of crime,
or things otherwise criminally possessed, to wit, Reckless Conduct (17-A M.R.S.A. § 211)"; and
"Property designed or intended for use or which is or has been used as the means of committing a
criminal offense."  Affidavit at [2].  Cashman described, in section III of his Affidavit, the following
as facts and circumstances supporting probable cause for issuance of the requested warrant:

A.     I am currently conducting an ongoing investigation concerning the
alleged discharge of a firearm from the residence of Christopher Poulos at 202 Coyle
St. (basement apartment) into the first floor apartment of the same building.

B.     On 04/09/07, I received a copy of a Portland PD [Police Department]
report detailing an investigation into an alleged firearm discharge in the apartment of
Christopher Poulos, located at 202 Coyle St. (basement apartment) in Portland, Maine.

C.     The report states that [on] 04/08/07, at approximately 2100 hours,
Portland Police Officers Ryan Rooney and Chris Mitchell responded to 202 Coyle St.
(basement apartment) to meet with Christopher and Christina Marsh (202 Coyle St. #1)
for a report of a possible bullet hole in their apartment.  Christopher Marsh told
Officers that he noticed a hole in his kitchen cabinet on 04/04/07.  There were shards
of wood spread throughout his kitchen.  It appeared to Marsh that someone had tried to
drill a hole from the outside in and he found this suspicious.  Marsh called his landlord
who checked with the upstairs apartment and did not notice anything suspicious from
that location.

D.     The report also states that Marsh then told Officers that on 04/08/07, at
approximately 1900 hours, he noticed a small hole in his kitchen floor.  He did not
notice this earlier.  He wrote in his statement that he thought it was a bullet hole
because the hole was caused by something that came from downstairs.  Marsh told
Officers that his downstairs neighbor was Christopher Poulos [*Affiant note: I have
spoken with Portland Police Detective Mary Sauschuck on several occasions.
Detective Sauschuck is assigned to the Portland PD intelligence unit and part of her
responsibility is collecting information on known gang members in the Portland*

3

*area. Detective Sauschuck told me that Christopher Poulos is a known member of FSU, a Portland gang known to traffic in drugs and firearms as well as engage in suspected intimidation and extortion. FSU members have both been convicted of and suspected of numerous aggravated assaults in the Portland area over the past several years. FSU is also a known support group for the Outlaws motorcycle club, a known organized criminal entity].*

E.     Officer Rooney wrote that Portland Police Evidence technician Christopher Stearns responded and took photographs of the damage. E/T Stearns was not able to find the discharged bullet. Attempts to reach Poulos in his apartment were unsuccessful.

F.     On 04/05[/]07, I spoke with MDEA SS/A Scott Pelletier. SS/A Pelletier told me that he had spoken to a source of information (hereafter referred to as a SOI) and the SOI told him the following, in substance: The SOI [*Note: SS/A Pelletier told me that the SOI has provided reliable and accurate information leading to the seizure of drugs during an ongoing investigation*] told SS/A Pelletier on 04/05/07 that IT had heard that Christopher Poulos had fired a machine gun through his bedroom ceiling in the past few days. The SOI told SS/A Pelletier that Poulos thought the bullet had entered the apartment above him.

G.     On 04/06/07, I spoke with a source of information (hereafter referred to as SOI 2). SOI 2 has provided me with reliable information in the past that has led to the seizure of drugs during an ongoing investigation. SOI 2 told me that Poulos told IT that he shot a machine gun in his apartment and was surprised that the Police had not shown up as he observed that the bullet went through his bedroom ceiling, into the apartment above him.

H.     On 04/09/07, I spoke with Portland Police Evidence Technician Christopher Stearns and he told me that based on his training, education, and experience, a high velocity bullet caused the holes. He also told me that he used a trajectory rod and was able to align the holes and determine the bullet had originated from below the kitchen floor.

I.     On 04/09/07, I spoke with MDEA SS/A Scott Pelletier and he told me that at 1335 hours, on 04/09/07, MDEA S/A's Jeffrey Calloway and Patrick Lally made contact with Poulos as he arrived at his apartment. He has not given consent for a search to his apartment as of this time.

*Id*. at [3]-[4]. In a different section of his Affidavit (section V(A)) Cashman added, *inter alia*, that

based on his experience, education, training and/or study and the known facts of the investigation, he

knew that:

4

> It is . . . common for those involved in the illegal trafficking/furnishing of scheduled drugs to possess, carry, maintain, and keep with, near and by them, in vehicles, and/or at the site(s) of drug operations or their residences firearms, ammunition and/or other dangerous devices . . . for the purpose of defending, guarding, and protecting their drugs, drug proceeds, drug operations, drug records and/or themselves.

*Id*. at [5].  Cashman included nothing in the Affidavit regarding the controlled drug purchases or the defendant's alleged placement of a handgun in a ceiling tile.  He excluded reference to the drug purchases because the investigation was still ongoing and he did not want to reveal the name of the CI, which he felt might jeopardize that individual's safety given the defendant's affiliation with a street gang some of whose members had been convicted of, or suspected of, assault and other violent crimes.  He was aware that court documents can be sealed but not that they can be sealed from the beginning of a case, before return of a search warrant.  Of course, sealed court documents can be ordered unsealed, a decision over which Cashman has no control.

Cashman began drafting the Affidavit and proposed Warrant at the Portland MDEA office at about noon on April 9, 2007.  At some point during the drafting process, he learned from Calloway that the defendant had stopped by his Coyle Street apartment.  Either then or later that day, Calloway told Cashman that the defendant had told him he no longer had the gun.

Cashman finished his draft by about 2 p.m.  Consistent with his usual practice, he ran it by his supervisor and an assistant attorney general.  He followed suggestions of the assistant attorney general that he incorporate more detail from the Portland Police Department report and that he speak directly to Stearns, the evidence technician.  After revising and finalizing his Affidavit, he departed for the Maine District Court building in Portland, arriving there between 2:30 and 2:40 p.m.

At the courthouse, Cashman typically makes contact with a court officer, who escorts him to the judges' waiting area and informs an administrative assistant that he is looking to have a judge review a search-warrant application.  A judge then typically reviews his papers and either comes out

5

to see him or calls him in.  Cashman does not go through a warrant application page by page with a judge but, rather, answers any questions the judge might have.  He swears to the truth of his affidavit and signs it in front of the judge.

Cashman does not recall whether, when he presented the instant application at the Maine District Court building, a judge was available immediately.  He met with Maine District Court Judge Paul Eggert at about 3 p.m., and Judge Eggert signed the Warrant at that time.  Before doing so, Judge Eggert pointed out that Cashman had neglected to put his name on the front page of the Warrant.  Cashman handwrote in his name, and both he and Judge Eggert initialed the change.  *See* Warrant at 1. Cashman does not know how much time Judge Eggert spent reviewing the papers.

Cashman now is aware that the Affidavit and proposed Warrant contain several errors in addition to that caught by Judge Eggert:

1.       In section II(B) of his Affidavit, and in paragraph B of the proposed Warrant, he should have deleted reference to "evidence of the offenses of possession, furnishing, and/or trafficking scheduled drugs" and substituted "evidence of the offense of reckless conduct."  *See* Affidavit at [2]; Warrant at 2.

2.       In section III(C) of his Affidavit, he should not have included the parenthetical expression "(basement apartment)" to describe the Marshes' apartment, which is upstairs from the defendant's basement apartment.  *See* Affidavit at [3].

3.       He should not have included Section V(A) of his Affidavit, detailing his knowledge of drug dealers' common practice of keeping firearms and other weapons, which is irrelevant to the reckless-conduct charge.  *See id.* at [5].

Cashman, an MDEA agent, typically seeks warrants involving crimes of drug trafficking.  In drafting the instant proposed Warrant and Affidavit, he modified a template he uses to seek search

6

warrants involving drug-trafficking crimes.  In so doing, he neglected to delete or modify all irrelevant portions of his boilerplate language.  Despite the errors, Cashman understood that the Warrant authorized a search for evidence of the crime of reckless conduct, as is reflected in the section of his Affidavit titled "Reason for Seizure."  He understood, despite the mistaken references to drug-trafficking crimes, that the Affidavit did not establish probable cause to search for evidence of the crime of drug trafficking and that the Warrant did not authorize such a search.

After making copies of the signed Warrant and Affidavit, Cashman proceeded to the defendant's apartment.  There he met with his supervisor, Pelletier, as well as fellow agents Lally, Calloway and Scott Durst.[2]  A briefing was held to confirm that the Warrant had been signed and that it authorized a search for evidence of the crime of reckless conduct.  Copies of the signed Warrant and Affidavit were available at the defendant's apartment.  At approximately 3:20 p.m., following the briefing, agents commenced their search.  The defendant's apartment is relatively small, consisting of a small closet, a bedroom, a kitchen/living-room area, a bathroom and, across from the exterior entryway to the apartment, a small storage area.  Pelletier searched for and immediately found a bullet hole in the defendant's bedroom ceiling.  Cashman found a ladder and used it to begin peering above the ceiling tiles in search of the handgun the CI had described having seen.  He recovered a Ruger .357 handgun loaded with rounds of ammunition from above a ceiling tile, a discovery reflected in the MDEA crime-scene evidence log as Item 1ND [non-drug].  *See* Joint Exh. 2.  In addition, agents seized the following items during the search: (i) Item 2ND, ammunition (various .357 rounds and one .22 round), from a kitchen cabinet; (ii) Item 3ND, eighteen shotgun shells, from a kitchen cabinet; (iii) Item 4ND, a savings deposit book and an electric bill, from a kitchen cabinet, (iv) Item 5ND, a

---

[2] Cashman did not recall whether an evidence technician was then present.  Nothing turns on the point at which the evidence technician *(continued on next page)*

handwritten note, from the bar area of the counter, (v) Item 6ND, a handgun holster, from the bedroom, (vi) Item 7D [drug], suspected Psilocybin (or mushrooms), from the bottom of a kitchen garbage can, (vii) Item 8ND, an Arm and Hammer box containing a suspected bullet hole, from the bottom of a kitchen garbage can, (viii) Item 9ND, the top of a digital scale, from a kitchen drawer, (ix) Item 10ND, the top of a grinder and a tinfoil FSU sign, from the kitchen, (x) Item 11ND, a shoebox containing numerous baggies, two digital scales, a grinder and two Inositol bottles, from the storage area, and (xi) Item 12ND, an empty Inositol bottle, from the bedroom.  *See, e.g., id*; Gov't Exhs. 1-15.  The suspected Psilocybin and the Arm and Hammer box were not visible upon peering into the kitchen trash can; agents had to hunt through the can to find them.  The shoebox seized from the storage area was covered by a lid, which agents had to remove to ascertain its contents.  Kitchen drawers or cabinets from which various items were seized were closed upon agents' entry into the apartment.

Psilocybin is a controlled substance.  In Cashman's estimation, the quantity found was distribution-level rather than personal-use level.  In Cashman's experience, digital scales are used by drug traffickers to weigh their wares prior to sale, and grinders are used by drug traffickers to combine powdered cocaine with a cutting agent, Inositol, which has a similar texture and color as cocaine.  By combining cocaine with a cutting agent, a drug trafficker can increase the volume of his wares, and hence his or her profits, without actually increasing the amount of the drug.

Cashman is not an expert in bullets and does not know whether high-velocity bullets can be fired only from high-velocity weapons.  The bullet fired through the ceiling into the upstairs apartment was never recovered.  Cashman does not agree with the proposition that a handgun is not a high-velocity weapon.  He cannot tell by looking at the Ruger whether that gun caused the bullet hole agents

---

arrived at the defendant's apartment.

8

were investigating.

## II.  Discussion

In his motion, the defendant argues that:

1.      The Warrant's description of items to be seized is overly broad inasmuch as probable cause was established only for search for a high-velocity weapon, casing(s), gunshot residue and damage to the bedroom ceiling.  *See* Motion at 9.

2.      By the time the Warrant was obtained, authorities were aware it was stale inasmuch as they knew the gun had been discharged at least five days prior thereto and had been told by the defendant that he no longer had the gun.  *See id.* at 9 n.2.

3.      The inventory of items seized was defective inasmuch as it did not contain all items seized and was not verified as required by Maine Rule of Criminal Procedure 41(d).  *See id.* at 9-10.

4.      The Ruger handgun and holster were not evidence of any criminal conduct and were improperly seized under any analysis.  *See id.* at 10.

5.      Identity evidence (Items 4ND and 5ND) must be suppressed inasmuch as the Warrant sought identity items related to crimes of drug trafficking but did not establish probable cause to believe drug trafficking had occurred.  *See id.* at 10-11.

6.      Inasmuch as the Affidavit did not establish probable cause to believe the defendant had been engaged in drug trafficking, all drug-trafficking evidence seized by agents must be suppressed. *See id.* at 11.

7.      Statements given before and after *Miranda* warnings should be suppressed.  *See id.* at 11-12.

At hearing, defense counsel confirmed – as the government had represented in its brief, *see* Government's Objection to Defendant's Motion To Suppress Evidence, etc. ("Response") (Docket

No. 30) at 7 n.10 – that he has withdrawn his argument concerning the making of a defective inventory. Counsel for the government also reiterated, as stated in the government's brief, *see id*. at 1 n.1, that the government does not intend to introduce in its case-in-chief any statements made by the defendant to police on April 9, 2007, thereby mooting the defendant's challenge to the admission of statements.

With respect to the defendant's remaining points, the government rejoins that (i) while the Warrant mistakenly includes references to the crime of drug trafficking, those mistakes are not fatal to its validity; (ii) there is no staleness problem; (iii) the Warrant's description of items to be seized is not overly broad, and the Ruger handgun, holster and ammunition properly were seized pursuant thereto, (iv) evidence of the crime of drug trafficking properly was seized pursuant to the plain-view exception to the warrant requirement, as was the Ruger handgun, assuming *arguendo* that it was not properly seized pursuant to the Warrant itself, and, (v) even assuming *arguendo* that the Warrant was overly broad or lacking in probable cause, agents acted in good faith, rendering suppression inappropriate pursuant to *United States v. Leon*, 468 U.S. 897 (1984). *See id.* at 6-16. In his papers and at hearing, defense counsel countered that as many as three of four exclusions to the *Leon* exception apply. *See, e.g.,* Defendant's Reply to the Government's Objection to Defendant's Motion To Suppress Evidence ("Reply") (Docket No. 33) at 3-4.

A defendant bears the burden of proving the illegality of a warrant; if he succeeds, the burden shifts to the government to prove entitlement to the *Leon* good-faith exception. *See, e.g., United States v. Longmire*, 761 F.2d 411, 417 (7th Cir.1985) ("The general federal rule on who bears the burden of proof with respect to an allegedly illegal search or seizure is based upon the warrant-no warrant dichotomy: If the search or seizure was effected pursuant to a warrant, the defendant bears the burden of proving its illegality; if the police acted without a warrant, the prosecution bears the burden of establishing legality."); *see also, e.g., United States v. Koerth*, 312 F.3d 862, 868 (7th Cir. 2002) ("If

10

a defendant is successful in establishing the invalidity of the search warrant, the burden then shifts to the Government to establish that the police relied in good faith on the judge's decision to accept the affidavit and issue the warrant.").

"[P]olice officers may seize an object in 'plain view' without a warrant if they have probable cause to believe it is contraband without conducting some further search of the object, i.e., if its incriminating character is immediately apparent." *United States v. Schiavo*, 29 F.3d 6, 9 (1st Cir. 1994) (citation and internal quotation marks omitted).  The government bears the burden of proving entitlement to the plain-view exception to the warrant requirement.  *See, e.g., United States v. Ribeiro*, 397 F.3d 43, 53 & n.8 (1st Cir. 2005).

For the reasons that follow, I conclude that (i) the defendant fails to carry his burden of proving the invalidity of the Warrant, (ii) in any event, assuming *arguendo* that the Warrant is in some respects invalid, the government carries its burden of proving applicability of the *Leon* good-faith exception, (iii) the defendant falls short of demonstrating that any exclusion to the *Leon* exception applies, and (iv) to the extent the police seized items beyond the scope of the Warrant, the government meets its burden of showing that those items lawfully were seized inasmuch as they were in plain view.

### A.  Warrant Particularity Requirement

The defendant's first point implicates the command of the Fourth Amendment that "no warrants shall issue, but upon probable cause, and particularly describing the place to be searched." *United States v. Bonner*, 808 F.2d 864, 866 (1st Cir. 1986) (citation and internal punctuation omitted).  The "manifest purpose" of this particularity requirement "is to prevent wide-ranging general searches by the police." *Id*.  The defendant relies heavily on *United States v. Roche*, 614 F.2d 6 (1st Cir. 1980), in which the First Circuit held overbroad a warrant authorizing seizure of all of an insurer's

documents for evidence of violation of 18 U.S.C. § 1341 when the police had established probable cause only to believe that the crime had been committed with respect to automobile insurance. *See* Motion at 6-9; *Roche*, 614 F.2d at 7 ("Here, the government could have limited the objects of search and seizure to documents and records pertaining to automobile insurance, but declined to do so. This impermissibly broadened the scope of the search beyond the foundation of probable cause.") (footnotes omitted).

The defendant posits that the instant Warrant authorized precisely the type of wide-ranging general rummaging the particularity requirement is designed to guard against inasmuch as it permitted search for a wide variety of weapons and drug-trafficking evidence when the accompanying Affidavit established probable cause to search only for a machine gun or similar high-velocity weapon, casing(s), gunshot residue and damage to the bedroom ceiling. *See* Motion at 7-9. In such circumstances, defense counsel argued at hearing, the appropriate remedy is blanket suppression of all evidence seized pursuant to the warrant – a proposition for which he cited *United States v. Fitzgerald*, 724 F.2d 633 (8th Cir. 1983), and 12A *Federal Procedure: Lawyers' Edition* § 33:697. He contended that, alternatively, the court should grant partial suppression on particularity grounds, banning the introduction of evidence seized on April 9, 2007 that does not fall within the confines of the Warrant as he posits it should have been tailored, including the Ruger handgun and all drug-related evidence seized from the defendant's apartment.

As a threshold matter, insofar as appears from my research, the First Circuit has declined to embrace blanket suppression as a remedy in cases in which a warrant is partially valid. *See, e.g., United States v. Falon*, 959 F.2d 1143, 1149 (1st Cir. 1992) ("The remedy in the case of a seizure that casts its net too broadly is, as we held in *United States v. Riggs,* 690 F.2d 298, 300 (1st Cir.

1982), not blanket suppression but partial suppression."). In any event, on the record made in this case, even partial suppression is unwarranted.

The defendant's characterization of the Warrant is itself overbroad. Most notably, the Warrant does not authorize search for evidence of the crime of drug trafficking. *See* Warrant at 2. Rather, it authorizes search for only two categories of evidence: (i) weapons and (ii) identity evidence. *See id.* As counsel for the government underscored at hearing, the crime of drug trafficking is mentioned only in connection with authorization to search for identity evidence, *i.e.*, "[e]vidence demonstrating identity, possession, dominion, custody or control by any and all individuals over/in the premises to be searched[,]" including fingerprints, hairs, fibers and documents. *Id*.

With respect to the first category of items to be searched – the weapons category – the defendant falls short of establishing that the Warrant is overbroad insofar as it authorizes a search for firearms-related evidence. *See id*. The bullet that penetrated the defendant's ceiling and entered his neighbors' apartment was never recovered. While the Affidavit represented that Stearns, the evidence technician, had established that the bullet hole was caused by a high-velocity bullet, the Affidavit did not represent that such a bullet can be fired only from a machine gun or similar weapon. Nor did the defendant adduce any evidence at hearing suggesting that (i) that is in fact the case, (ii) Cashman knew it to be the case, or (iii) any reasonable law-enforcement officer would have known it to be the case.

The defendant makes much of the fact that the Affidavit also relayed that two confidential informants, who had provided reliable information in the past, had reported that the defendant told them he had fired a machine gun from his apartment. *See* Motion at 8; Reply at 2. Nonetheless, even if, as the Affidavit suggests, the informants accurately relayed the substance of their conversation with the defendant, their reports do not definitively establish that the offending weapon was a machine gun. The Affidavit provided no indication that (i) either informant had seen a machine gun in the

13

defendant's possession or in his apartment, (ii) the defendant necessarily told the informants the truth about the nature of the weapon fired, or (iii) the police were able to confirm following investigation that the weapon was a machine gun.  In the circumstances, and in the absence of any evidence tending to show that officers could or should have differentiated among firearms capable of firing a high-velocity bullet, the Warrant permissibly authorized a search, *inter alia*, for firearms and ammunition (such as Items 1ND, 2ND and 3ND).  *See, e.g., United States v. Morris*, 977 F.2d 677, 681 (1st Cir. 1992) ("General descriptions in warrants . . . have been accepted when the surrounding circumstances render it reasonable."); *United States v. Fuccillo*, 808 F.2d 173, 176 (1st Cir. 1987) ("general descriptions are permissible only in special contexts in which there [is] substantial evidence to support the belief that the class of contraband [is] on the premises and in practical terms the goods to be described [can] not be precisely described.") (citation and internal quotation marks omitted).[3] While the holster (Item 6ND) and Arm and Hammer box containing a suspected bullet hole (Item 8ND) are not among items expressly enumerated in the weapons category of the Warrant, authority to search is "not limited to" the enumerated items.  *See* Warrant at 2.  Officers permissibly seized the holster as evidence linking the defendant to a firearm from which the bullet might have been fired and the Arm and Hammer box as evidence tending to incriminate the defendant with respect to the crime in question.

With respect to the second category of items to be seized – identity evidence – I agree with the government that it is reasonably clear from examination of the Warrant and Affidavit (which is attached to and incorporated by reference in the Warrant, *see* Warrant at 1, and therefore validly may

---

[3] Even assuming *arguendo* that, with respect to ammunition, the Warrant should have authorized a search only for high-velocity ammunition, the defendant adduced no evidence that the ammunition actually seized is not high-velocity ammunition.  He thus falls short of demonstrating a basis for suppression of any of that ammunition.

be taken into account in assessing whether the Warrant is overbroad, *see, e.g., Roche*, 614 F.2d at 8) that the language referencing drug trafficking was mistakenly included.  The Affidavit makes clear that the "Reason for Seizure" is to obtain evidence of the crime of reckless conduct; the focus of its customized facts section is the alleged firearm discharge.  *See* Affidavit at [2]-[4].  What is more, as the government suggests, *see* Response at 10, Cashman, who had drafted the proposed Warrant and Affidavit and understood the Warrant only to authorize search for evidence of the crime of reckless conduct, was present throughout the search, including during a briefing at which all participating agents were advised that the Warrant authorized search for evidence of the crime of reckless conduct.  As the government notes, *see id.*, such circumstances militate in favor of a finding that an error is merely technical, *see, e.g., United States v. Bianco*, 998 F.2d 1112, 1117 (2d Cir. 1993) ("The affidavit was present at the time of the search, and spells out quite clearly the nature and purpose of the proposed search.  It explains in detail the motivation behind the search and the nature of the documents sought.  When the warrant and affidavit are read together, there is no ambiguity.  Moreover, although the warrant may not have explicitly incorporated the affidavit, the presence and activity of agent Hutton, who had read the affidavit and who approved each seizure, satisfies us that the limitations included in the affidavit were observed.").

In any event, it is difficult to see how the mistake in question could have made any difference in the nature of the ensuing search.  The identity-evidence section of the Warrant authorizes search for documents establishing the identity of the apartment's occupants/visitors – things such as Item 4ND, the savings-deposit book and electricity bill, and Item 5ND, the handwritten note.  The final clause in that section of the Warrant merely describes the nature of the crime with respect to which those items have evidentiary value; it does not transmute the character of the evidence to be sought or seized.  *See* Warrant at 2.

15

For all of the foregoing reasons, the defendant fails to make a persuasive case that suppression of any of the firearms-related or identity evidence seized (Items 1ND, 2ND, 3ND, 4ND, 5ND, 6ND and 8ND) is appropriate on grounds of the asserted overbreadth of the Warrant.[4]

### B. Staleness Argument

The defendant next asserts that by the time the Warrant was obtained, authorities were aware it was stale because they knew the gun had been discharged at least five days earlier and had been told by the defendant that he no longer had the gun. *See* Motion at 9 n.2. This assertion is without merit. Officers sought a warrant within a day of taking a complaint from the defendant's upstairs neighbors that they had discovered what appeared to be a bullet hole in their apartment. That complaint, in turn, appeared to have been lodged within a matter of a few days of the apparent gun discharge. Cashman, the only witness at hearing, did not recall whether he learned before or after applying for the Warrant that the defendant had a conversation with Calloway in which the defendant claimed he no longer had the gun. In any event, officers were not obliged to take the defendant's claim at face value, and they sought other evidence besides the gun – for example, evidence of gunshot residue and damage to the defendant's ceiling. In the circumstances, the information possessed by officers was not too stale to convey probable cause for the search. *Compare, e.g.*, *United States v. Bizier*, 111 F.3d 214, 219 (1st Cir. 1997) ("a long delay in seeking a search warrant can create difficulties if the information is stale") (emphasis omitted).

### C. *Leon* Good-Faith Exception

In the event the court should disagree with my conclusion that the defendant falls short of

---

[4] This analysis is dispositive of the defendant's fourth and fifth points – that the Ruger handgun and holster were not contraband or evidence of any criminal conduct and were improperly seized under any analysis, and that documents seized as evidence of possessing, distributing or trafficking in scheduled drugs (*i.e.*, Items 4ND and 5ND) must be suppressed. *See* Motion at 9-10. Accordingly, I do *(continued on next page)*

proving the invalidity of the Warrant, I consider the government's backstop *Leon* argument. *See* Response at 13-16. Pursuant to *Leon*, "[e]vidence seized in violation of the Fourth Amendment is admissible in court if the government placed an objectively reasonable reliance on a neutral and detached magistrate judge's incorrect probable cause determination." *United States v. Crosby,* 106 F. Supp.2d 53, 58 (D. Me. 2000), *aff'd*, 24 Fed. Appx. 7 (1st Cir. 2001) (citation and internal quotation marks omitted). The *Leon* exception is itself subject to exceptions:

> There are four exclusions to the *Leon* good-faith exception: (1) when the magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth; (2) where the issuing magistrate wholly abandoned his detached and neutral judicial role; (3) where the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where a warrant is so facially deficient – i.e. in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid.

*United States v. Owens*, 167 F.3d 739, 745 (1st Cir. 1999) (citation and internal punctuation omitted). The defendant bears the burden of rebutting the government's good-faith showing by demonstrating that one or more of the *Leon* exclusions applies. *See, e.g., Koerth*, 312 F.3d at 868.

The government meets its *Leon* burden, showing that (i) Cashman, who was modifying a template geared toward drug-trafficking crimes, mistakenly included references relevant to such crimes (and irrelevant to the crime of reckless conduct) in his Affidavit and proposed Warrant, (ii) as per his usual practice, Cashman sought review of the Affidavit and proposed Warrant by his supervisor and an assistant attorney general, neither of whom picked up on the mistakes, and (iii) Cashman understood the Warrant to authorize only search for evidence of the crime of reckless conduct.

At hearing and in his papers, the defendant invoked the first, second and fourth *Leon*

---

not separately address those points.

17

exclusions, arguing that:

1.      Given the time sequences and the fact that the issuing judge missed blatant errors in the Affidavit and proposed Warrant, it can be fairly inferred that he simply rubber-stamped the Warrant.

2.      The agent should have known it was an invalid warrant because indeed it was, and he acknowledges that.

3.      Cashman omitted to include in the Affidavit information known to him.

The defendant fails to make a persuasive case as to any of these points.  Defense counsel argued at hearing that the court should find, as a factual matter, that Judge Eggert signed the Warrant at approximately the same time as he first saw the papers (at about 3 p.m.).  However, Cashman's testimony was that he arrived at the courthouse twenty to thirty minutes prior to the time Judge Eggert signed the Warrant.  Although Cashman did not remember precisely what happened in that instance, he testified that he typically hands his papers to a court officer, who provides them to a judge for review, and that the judge meets with him afterward (after having had an opportunity to review the papers).  In the circumstances, I am unwilling to infer that the judge failed to scrutinize these papers.  Further, while the judge did not detect the mistaken reference to the crime of drug trafficking, he did pick up on an error in the Warrant, the omission of Cashman's name on the front page.  I am unpersuaded that the issuing judge "wholly abandoned his detached and neutral judicial role[.]"  *Owens*, 167 F.3d at 745 (citation and internal quotation marks omitted).

While Cashman acknowledged that the Affidavit and proposed Warrant contained several mistakes, most of which (including incorporation of irrelevant drug-trafficking language) resulted from his failure to delete those sections from the boilerplate language he used as a starting point, he never admitted that the Warrant was invalid.  Nor can it be said that it was so facially deficient that executing officers could not reasonably presume it to be valid.  As noted above, the Warrant

18

authorized search for two categories of things: weapons evidence and identity evidence.   The Affidavit provided ample probable cause to believe that evidence of the crime of reckless conduct would be discovered in the defendant's apartment.  Both categories of evidence listed in the Warrant were relevant to that crime.

Finally, the defendant posits that Cashman omitted important information from the Affidavit, failing to inform the issuing judge of the ongoing drug investigation, including the confidential informant's report that the defendant had placed a handgun in a ceiling tile.  *See, e.g*., Reply at 4 n.4. Nonetheless, the defendant fails to explain how inclusion of that information could have altered the judge's analysis.  Nor is the materiality of the information, which Cashman omitted for good reason (concern for the safety of the informant), otherwise apparent.  The drug-investigation information was irrelevant, and the handgun information simply would have added additional heft (although no more was required) to the probable-cause finding.  It therefore is difficult to discern how these omissions "misled" the issuing judge.

For these reasons, to the extent the court finds the Warrant to have been invalid, the *Leon* good-faith exception applies, and the Motion should be denied to the extent it seeks suppression of items seized pursuant to the Warrant.

### D.  Plain-View Doctrine

A final category remains: drugs or drug-trafficking-related items.  The government concedes that seizure of these items was not authorized by the Warrant but asserts that officers validly seized them inasmuch as they were in plain view.  *See* Response at 12-13.  The governments meets its burden of proving the validity of their seizure.

"It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence."  *United*

19

*States v. Meada*, 408 F.3d 14, 23 (1st Cir. 2005) (citation and internal quotation marks omitted). "[P]olice officers may seize an object in 'plain view' without a warrant if they have probable cause to believe it is contraband without conducting some further search of the object, i.e., if its incriminating character is immediately apparent." *Schiavo*, 29 F.3d at 9 (citation and internal quotation marks omitted); *see also, e.g., United States v. Friel*, 448 F. Supp.2d 222, 227 (D. Me. 2006) ("[O]nce law enforcement reached the head of defendant's bed pursuant to a search warrant that included the entire residence, they were entitled to seize the weapon in 'plain view,' because given the defendant's status as a felon, it was illegal for him to possess the firearm and, therefore, it was reasonable for them to believe that the gun was evidence of a crime.").

The items in issue are Item 7D, the suspected Psilocybin (or mushrooms) seized from the bottom of a kitchen garbage can; Item 9ND, the top of a digital scale, seized from a kitchen drawer; Item 10ND, the top of a grinder, seized from the kitchen; Item 11ND, a shoebox containing numerous baggies, two digital scales, a grinder and two Inositol bottles, seized from the storage area; and Item 12ND, an empty Inositol bottle, seized from the bedroom. *See, e.g.,* Joint Exh. 2.

Officers had a right to be in the position to have a view of each of those items. The Warrant authorized search not only for firearms but also for much smaller items such as bullet casings and ammunition. Officers legitimately searched through the contents of the kitchen garbage can, opened drawers and cabinets and removed the lid from the shoebox found in the storage room in search of the authorized items. The incriminating character of the drug-related items seized was immediately apparent to Cashman, a trained MDEA agent, and presumably to his MDEA colleagues assisting in the search. He recognized the bagged mushrooms as Psilocybin, a controlled substance, and recognized the digital scales, grinder, baggies and Inositol bottles as items commonly used in the drug-trafficking trade in general or in aid of cocaine trafficking specifically. Those items accordingly were validly

seized pursuant to the plain-view exception to the warrant requirement.

### III.  Conclusion

For the foregoing reasons, I recommend that the proposed findings of fact herein be adopted

and that the Motion be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which <u>de novo</u> review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the district court and to appeal the district court's order.*

Dated this 25th day of January, 2008.

<u>/s/ David M. Cohen</u>
David M. Cohen
United States Magistrate Judge